**In the United States District Court
for the District of Kansas**

———

Case No. 5:22-cr-40004-TC

———

UNITED STATES OF AMERICA

v.

ESTEBAN VASQUEZ

———

**MEMORANDUM AND ORDER**

The Government has charged Esteban Vasquez with one count of possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine under 21 U.S.C. § 841(a)(1). Doc. 1 at 1–2. Vasquez moves to suppress evidence the Government obtained from his car after a traffic stop. Doc. 22. His motion is denied.

**I**

**A**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches and seizures of people or their personal property are presumed unreasonable. *United States v. Karo*, 468 U.S. 705, 717 (1984). The Government may rebut that presumption by showing that an exception to the warrant requirement applies. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). So while it is the defendant's burden to show the Fourth Amendment is implicated, once he carries that burden, the Government must show that a warrant was not required under the circumstances. *United States v. Neugin*, 958 F.3d 924, 930 (10th Cir. 2020).

The Fourth Amendment requires every traffic stop to be justified at its inception and remain reasonably limited in scope to those circumstances. *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir.

1

2005). The traffic stop must conclude once its mission has been accomplished unless the initial detention becomes a consensual encounter, *see Bradford*, 423 F.3d at 1158, or the officer develops reasonable suspicion of other illegal activity, *see Rodriguez v. United States*, 575 F.3d 348, 354–55 (10th Cir. 2015); *see also United States v. Gomez-Arzate*, 981 F.3d 832, 842 (10th Cir. 2020).

If a search or seizure violates the Fourth Amendment, the exclusionary rule generally forbids the Government from using evidence obtained from that search or seizure at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009). That rule applies only where it "result[s] in appreciable deterrence" for law enforcement. *Id.* at 141 (alteration in original) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Suppression is therefore not "an automatic consequence of a Fourth Amendment violation." *Id.* at 137.

**B**

On November 19, 2021, Esteban Vasquez was driving in a rental car with his girlfriend, Blanca Chavez, eastbound on Interstate 70 near Salina, Kansas. Doc. 22 at 1. At 7:24 a.m., Kansas Highway Patrol Trooper Justin Rohr clocked Vasquez driving at 98 miles per hour in a 75-mile-per-hour zone. *Id.* at 2. Rohr pursued Vasquez's car and activated his emergency lights, then Vasquez pulled over to the shoulder of the Interstate. *Id.*; Def. Ex. 801 at 2:02. When both cars had stopped, Rohr exited his patrol car and approached Vasquez's car on the driver's side. Doc. 28 at 2.

At Vasquez's window, Rohr explained that he had pulled Vasquez over for speeding and asked for his driver's license and rental agreement. *Id.* Rohr then asked where they were headed. Doc. 22 at 2. Vasquez remained silent, but Chavez said they were going to Missouri. Doc. 28 at 2. When Rohr asked where in Missouri, neither of them responded. *Id.* Vasquez told Rohr he had rented the car but could not find the rental agreement, which he believed was digital. *Id.* at 2–3. Rohr told him to come back to the patrol car and sit in the passenger seat while he continued looking for the agreement on his phone. Doc. 22 at 2.

Rohr and Vasquez talked in the patrol car for about twelve and a half minutes. *Id.* at 3. Rohr asked again where in Missouri Vasquez and Chavez were headed. Doc. 28 at 3. This time, Vasquez said they were driving to Tennessee and planned to stay in Nashville for three or four

days. *Id.* When Rohr asked why they did not fly, Vasquez said they were driving because his aunt lived in California. *Id.* Vasquez was distracted during the conversation because he was searching his phone for the rental agreement, Doc. 22 at 3, and he "appeared nervous," Doc. 28 at 4. While he and Vasquez were in the patrol car, Rohr learned from dispatch that Vasquez had a criminal history that included drug charges. Docs. 22 at 3 & 28 at 3.

Despite spending several minutes searching his phone, Vasquez still could not locate the rental agreement. Doc. 28 at 3. Rohr asked Vasquez to look for it again in the passenger compartment of the rental car, but Vasquez was still unable to locate the agreement and returned to the passenger seat in Rohr's patrol vehicle. *Id.* Finally, Rohr printed Vasquez's ticket, explained how to pay it, asked Vasquez if he had any questions, and told him to slow down. Doc. 22 at 4. Rohr then handed Vasquez the ticket, his driver's license, and Chavez's identification card and said, "I'll let you give these to her." *Id.* There was nothing in the parties' pleadings nor any evidence submitted at the suppression hearing to suggest that Rohr still had possession of any of Vasquez's or Chavez's paperwork. And Chavez—presumably the "her" Rohr was referencing—remained in the rental vehicle.

The parties dispute what happened next. The Government claims that Vasquez started to leave the patrol car, Doc. 28 at 4, but Vasquez says that he remained seated in the patrol car when Rohr started to question him again, Doc. 22 at 8. The video does not indicate that Vasquez opened the door or otherwise tried to leave. Def. Ex. 801 at 16:03. In any case, while Vasquez was still in the passenger seat and before he had opened the passenger door, Rohr asked Vasquez whether he could ask him some questions. Doc. 22 at 4. Vasquez did not say yes, but instead asked Rohr about the fine amount on the ticket. Docs. 22 at 4 & 28 at 4. Rohr answered him, then asked Vasquez whether he had anything illegal in the car, including guns, drugs, alcohol, marijuana, cocaine, heroin, and methamphetamine. Doc. 22 at 5. Vasquez answered no to each question. *Id.* Rohr then asked if he could search the car, and Vasquez said "Sure." *Id.*

Rohr's search of Vasquez's car uncovered the evidence at issue in this motion. He found cash in the center console and a paper bag in the trunk, which held several clear plastic bags that Rohr suspected contained methamphetamine. Doc. 28 at 4. Rohr then arrested Vasquez. *Id.* After searching the vehicle further, officers recovered a

3

total of $17,155 in cash, seven pounds of methamphetamine, two and a half pounds of heroin, and two and a half pounds of fentanyl. *Id.*

### C

Vasquez filed a motion to suppress the evidence obtained from the car. Doc. 22. He does not claim that the initial stop was illegal— Vasquez admits that Rohr reported his speed as "98 miles per hour in a posted 75 miles per hour zone," Doc. 22 at 2, and that Rohr "was permitted by law to conduct ordinary inquiries incident to the traffic stop," *id.* at 6. Instead, Vasquez argues that Rohr impermissibly extended the stop in violation of *Rodriguez*, 575 U.S. at 348, and that the subsequent warrantless search "violate[d] the Fourth Amendment" because no exceptions to the warrant requirement apply, Doc 22 at 2, 11. An evidentiary hearing on the motion to suppress was held on September 28, 2022. Doc. 30.[1]

### II

Vasquez fails to identify a Fourth Amendment violation in this encounter. Once the initial stop ended and Rohr returned all of the paperwork to Vasquez, Vasquez consented to additional questioning. But even if the stop had not become consensual, by the time Rohr handed him the ticket, Rohr had reasonable suspicion to believe he was trafficking drugs and that alone warranted additional investigation. In either case, Vasquez voluntarily consented to the subsequent search of his car. As a result, the evidence obtained from this encounter will not be suppressed.

### A

Vasquez claims he did not voluntarily consent to extend the traffic stop. This argument is unavailing.

**1.** After completing a traffic stop, an officer may engage the driver in a consensual encounter, during which the officer may question the driver. *Gomez-Arzate*, 981 F.3d at 842. "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive

---

[1] At the hearing, the Government reviewed the rental agreement Vasquez produced, Doc. 29-1, and conceded that Vasquez has standing to raise a Fourth Amendment defense to the car search.

questioning by a law enforcement officer." *United States v. Mercado-Gracia*, 989 F.3d 829, 836 (10th Cir. 2021) (quoting *Gomez-Arzate*, 981 F.3d at 842). When determining whether an encounter is consensual, the focus is on police conduct—specifically, whether it "would have conveyed to a reasonable person that he or she was not free to decline the officer's requests or otherwise terminate the encounter." *Id.* (quoting *Bradford*, 423 F.3d at 1158).

The Government bears the burden to prove the police stop became consensual. *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017). The Tenth Circuit has held that there is a bright-line rule that requires the driver's documents to be returned before the encounter may become consensual. *Mercado-Gracia*, 989 F.3d at 836. But that alone is not sufficient. The Tenth Circuit considers several non-exclusive factors when analyzing an extended stop, including:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*Id.* (quoting *Gomez-Arzate*, 981 F.3d at 842). No one factor is dispositive—the focus remains on "the coercive effect of police conduct, taken as a whole on a reasonable person." *Id.*

**2.** The Government has shown that the stop became consensual. As a result, the continued detention does not implicate the Fourth Amendment.

To begin with, Rohr returned all of Vasquez's documents, including his driver's license and Chavez's identification card. Doc. 29 at 4–5. This satisfies the prerequisite to a consensual extension of a traffic stop. *Mercado-Gracia*, 989 F.3d at 836. There was nothing more Vasquez would have needed to retrieve from Rohr before returning to his car.

5

Most of the *Mercado-Gracia* factors support the Government's position. Vasquez does not allege that Rohr touched or physically restrained him, nor that Rohr unholstered his firearm. Rohr was also the only officer involved in the stop. Doc. 28 at 16. Furthermore, the recording of the stop, Def. Ex. 801, supports the Government's claim that Rohr maintained a conversational tone throughout the encounter, Doc. 28 at 16. And none of Vasquez's personal effects remained in Rohr's possession. Doc. 22 at 3–4. These factors support a conclusion that Rohr did not coerce Vasquez into consenting to further questioning.

And even though a few of *Mercado-Gracia* factors weigh in Vasquez's favor, the circumstances of the stop mitigate their impact. Two factors in particular combine to support Vasquez's strongest argument: Rohr instructed Vasquez to exit the rental car and to sit in the patrol vehicle, and Rohr continued to question him without expressly telling Vasquez that he was free to leave. Docs. 22 at 2–3, 10 & 29 at 6.

Neither of these factors, either individually or collectively, undermine the validity of Vasquez's consent in this case. The mere fact that consent was obtained while both the officer and the defendant were inside a patrol car does not make that consent involuntary. *United States v. Gigley*, 213 F.3d 509, 514 (10th Cir. 2000). And an officer need not specifically tell a defendant he is free to leave before an encounter can become consensual. *United States v. West*, 219 F.3d 1171, 1176–77 (10th Cir. 2000); *see also Ohio v. Robinette*, 519 U.S. 33, 39–40 (1996) (rejecting a *per se* rule "requir[ing] police officers to always inform detainees they are free to go" before obtaining voluntary consent). Furthermore, the Tenth Circuit has held that an encounter may become voluntary even if the defendant was directed to sit in the patrol car and the officer never gave him explicit permission to leave. *See Bradford*, 423 F.3d at 1154, 1158–59 (10th Cir. 2005) (holding that although the defendant was "seated in the rear of a trooper's vehicle" and therefore "would not necessarily view herself as free to exit the vehicle if [the officer] continued with a stream of questions," the encounter became consensual because the officer did not make any "coercive show of authority"); *Gigley*, 213 F.3d 509 at 514 (finding an encounter consensual even though both the officer and the defendant remained in the patrol car and the officer had only said, "that's all I have for you"); *Anderson*, 114 F.3d at 1064 (holding that the post-stop encounter became consensual even though both parties were still in the patrol car and the officer did

6

not tell the defendant he was free to leave after returning his documents).

An unpublished Tenth Circuit decision, *United States v. Rodriguez*, 186 F. App'x 812 (10th Cir. 2006), is helpful to the analysis.[2] After stopping the defendant for driving with a defective tag lamp, the officer told the defendant to join him in the patrol car. *Id.* at 813. The officer wrote a warning citation, handed it to the defendant, and told her to be careful on her trip. Then, while both of them were still sitting in the patrol car, the officer asked the defendant if he could ask her more questions. *Id.* She responded with a question: "I don't . . . . Do I need to take the paper to get my taillight or my license tag light fixed?" *Id.* The officer answered her question, then he proceeded to ask her whether she had any guns or drugs in her car. *Id.* at 814. The Tenth Circuit held the stop became consensual because "a reasonable person in the defendant's position would have known that she was free to leave." *Id.* at 816.

The situation in *Rodriguez* is similar to this case. As in *Rodriguez*, Rohr and Vasquez remained in the patrol car after Rohr handed Vasquez his documents. Doc. 29 at 6. And like the officer in *Rodriguez*, Rohr never explicitly told Vasquez he was free to go. *Id.* But Rohr did implicitly give Vasquez permission to leave when he reminded Vasquez to "slow it down" and said that he would let Vasquez give Chavez the documents. Doc. 22 at 4. The mere fact that Rohr never told Vasquez he was free to leave the patrol car or refuse to answer questions, without an "overbearing show of authority," did not prevent him from obtaining Vasquez's voluntary consent. *Rodriguez*, 186 F. App'x at 815–16; *contra* Doc. 29 at 6–7. Although Rohr's failure to expressly tell Vasquez he was free to leave supports Vasquez's argument, it bears less weight because Rohr gave him implicit permission to return to his car.

And even though the questioning happened in the patrol car, that location factor is mitigated because the encounter occurred in a public place. The Tenth Circuit has held that "the shoulder of an interstate highway" is "a public location." *United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (quoting *United States v. Soto*, 988 F.2d 1548, 1558

---

[2] *Rodriguez* is unpublished and not precedential, *see* D. Kan. R. 7.6(c), but the factual similarity between it and the instant case makes its reasoning particularly persuasive.

(10th Cir. 1993)). Moreover, "'the typical traffic stop is public, at least to some degree,' there are witnesses, and the 'exposure to public view' reduces a person's fear of abuse if he or she does not cooperate." *United States v. Ward*, 961 F.2d 1526, 1531 (10th Cir. 1992) (quoting *INS v. Delgado*, 466 U.S. 210, 224 (1984) (Powell, J., concurring in the result)). While this was not a typical traffic stop, the patrol car was in "broad daylight on an interstate highway." *United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007). This factor therefore weighs only slightly in Vasquez's favor.

Similarly, Rohr never explicitly "receiv[ed] Mr. Vasquez's consent to extend the encounter." Doc. 22 at 10. Vasquez claims that this point "most distinguishes this case from other reviewed by the Tenth Circuit." *Id.* But consent to talk with a police officer need not be either expressly stated or explicit. In *Rodriguez*, 186 F. App'x at 815, the Tenth Circuit held that even though the defendant did not explicitly consent to further questioning, she had nevertheless given valid consent because she "appeared to understand and easily answer [the officer's] questions" and "did not hesitate to answer." Once again, the situation in *Rodriguez* is similar to this case. After telling Vasquez he could return to his car and give the documents to Chavez, Rohr requested to ask Vasquez some more questions. Doc. 22 at 4. Vasquez responded by asking about the amount on the ticket. *Id.* Just like the officer in *Rodriguez*, Rohr answered Vasquez's question and then followed up by asking if he had anything illegal in the car. *Id.* at 5. And Vasquez, like the driver in *Rodriguez*, appeared to understand and easily answer Rohr's questions. *Id.*

Rohr was uniformed during the stop and was visibly armed, Doc. 22 at 10, which favors Vasquez's argument. Yet "those factors . . . have little weight in the analysis," *United States v. Drayton*, 536 U.S. 194, 204 (2002), especially because there is no indication that Rohr removed his firearm at any point, Doc. 28 at 16 ("[N]o weapons were ever unholstered."). And an officer's holstered firearm "is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." *Drayton*, 536 U.S. at 205. These factors favor Vasquez, but they bear little weight in the totality of the circumstances.

In sum, the totality of the *Mercado-Gracia* factors supports the conclusion that the stop became consensual. Rohr returned all Vasquez's documents before requesting to extend the stop. He did not touch or physically restrain Vasquez, did not draw or brandish his firearm, remained the only officer on the scene, presented a casual demeanor with

a conversational tone, and returned Vasquez's personal effects before questioning him. Some of the factors weigh against the Government—Rohr never explicitly told Vasquez he could leave or refuse consent, the questioning took place in a patrol car, and Rohr was uniformed—but each of them is mitigated in context. Under the totality of the circumstances and in light of existing Tenth Circuit decisions that are factually similar, a reasonable person would have felt free to return to his car instead of answering more questions. The stop therefore became consensual before Rohr questioned Vasquez further. And because the encounter became consensual, it "do[es] not implicate the Fourth Amendment." *United States v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018) (quoting *United States v. Davis*, 94 F.3d 1465, 1467 (10th Cir. 1996)).

**B**

Even if the encounter had not become consensual and the Fourth Amendment were implicated, any continued detention of Vasquez was justified because Rohr had reasonable suspicion to believe criminal activity was afoot. The Government bears the burden to prove reasonable suspicion, *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010), and it has done so. By the time he had accomplished the purpose of the traffic stop and returned the paperwork to Vasquez, Rohr had reasonable suspicion of criminal activity. The extended stop is therefore further validated under the Fourth Amendment.

**1.** Reasonable suspicion is "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Kansas v. Glover,* 140 S. Ct. 1183, 1187 (2020) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). This is a lower standard than probable cause: where probable cause requires a "substantial chance of criminal activity," *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983), reasonable suspicion requires only "some minimal level of objective justification," *United States v. Sokolow*, 490 U.S. 1, 7 (1989). The inquiry depends on "the totality of the circumstances." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Cortez*, 449 U.S. at 417). The emphasis is on the "whole picture," *Cortez,* 449 U.S. at 417, and rejects a "divide-and-conquer analysis" of a situation's relevant factors, *United States v. Arvizu*, 534 U.S. 266, 274 (2002). While a mere "hunch" is not enough, "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette*, 572 U.S. at 397 (internal quotation marks omitted) (quoting *Sokolow*, 490 U.S. at 7).

9

The reasonable suspicion analysis is objective. "An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Brigham City*, 547 U.S. at 404 (alterations in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). That said, officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. *Arvizu*, 534 U.S. at 273.

**2.** By the time he returned Vasquez's license and gave him the citation, Rohr had developed reasonable suspicion of drug trafficking, which warranted extending the stop. His observations, combined with his experience with drug-trafficking crimes, support this conclusion. In particular, Rohr considered that Vasquez could not produce his rental agreement during the stop, Doc. 28 at 27; gave inconsistent answers about where he was driving to, *id.* at 24; was traveling overnight, *id.* at 26; had a car seat in the back with no child in it, *id.* at 24; did not know where he and Chavez would be staying either that day or at their destination, *id.* at 25–26; was driving an indirect route to his destination, *id.* at 26; had a quick turnaround for such a long drive, *id.*; and had a prior drug conviction, *id.* at 29.

Many of these same observations have featured in Tenth Circuit opinions finding reasonable suspicion to conduct a search. For instance, the Tenth Circuit has consistently held that implausible travel plans can contribute to reasonable suspicion. *United States v. Pettit*, 785 F.3d 1374, 1381 (10th Cir. 2015); *see also United States v. Santos*, 403 F.3d 1120, 1130–32 (10th Cir. 2005) (finding that inconsistent, vague, or evasive answers regarding travel plans contributed to reasonable suspicion). Even if implausible travel plans can be consistent with innocent travel, they may still contribute to reasonable suspicion when taken together with other factors. *Sokolow*, 490 U.S. at 9–10. And staying only a short time at the destination after a long trip may also support reasonable suspicion. *Simpson*, 609 F.3d at 1152.

The answers Chavez and Vasquez gave about their travel plans were dubious and seemingly inconsistent. Chavez first said they were driving to Missouri, Doc. 28 at 2, but Vasquez said they were going to Tennessee, *id.* at 3. When Rohr asked why they did not fly to Tennessee, Vasquez responded that it was because his aunt had been in California with them, Doc. 22 at 3, which does not seem to make sense as a reason to drive rather than fly. Furthermore, Vasquez said the purpose of their trip was to visit Chavez's family, Doc. 28 at 24, so it would

10

have been suspicious that Chavez apparently did not know where they were going. Vasquez also said he and Chavez had left their children in California, *id.*, and apparently had not brought even Chavez's children to visit her family. The car seat in the back was allegedly for Vasquez's aunt's child, *id.* at 3, but he had previously said his aunt lived in California, *id.* And they said that they had stopped in Aurora, Colorado, which is well out of the way of the most direct route from Southern California to Tennessee. *Id.* Finally, after driving across the country, they planned to stay in Nashville for only three or four days. *Id.* These curious travel plans support Rohr's testimony that he developed reasonable suspicion to continue investigating Vasquez. *See generally Cortez*, 449 U.S. at 412 ("[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion.").

So too with Vasquez's drug conviction. "[I]n conjunction with other factors, criminal history *contributes powerfully to the reasonable suspicion calculus*." *Simpson*, 609 F.3d at 1147 (alterations in original) (quoting *United States v. White*, 584 F.3d 935, 951 (10th Cir. 2009)). In the patrol car after his initial encounter with Vasquez, Rohr learned that Vasquez had a criminal history involving drug distribution. Doc. 28 at 29. While the parties dispute what type of drug charge this was, that level of detail is largely academic because it provides some evidence of reasonable suspicion when combined with Rohr's other observations that were, in his training and experience, consistent with drug trafficking.

That is not to say that every circumstance or even each one that Rohr considered pointed only one way. Some of the factors that Rohr mentioned as part of his reasonable suspicion determination are irrelevant to finding reasonable suspicion. For example, his testimony that it took Vasquez longer than usual to pull over is not persuasive. *Contra* Doc. 28 at 23. The video evidence shows that Vasquez started to slow down and pull over as soon as Rohr turned on his light bar. Def. Ex. 801 at 2:02. Likewise, Rohr said one of the factors that played into his reasonable suspicion was that Vasquez was driving on Interstate 70, a "major corridor for illegal activity." Doc. 28 at 26. But as an interstate highway, Interstate 70 is a major corridor for activity in general, both legal and illegal. Merely driving on the interstate is so commonplace as to be nearly irrelevant. *See Vasquez v. Lewis*, 834 F.3d 1132, 1137–38 (10th Cir. 2016) (holding that the defendant driving on an interstate highway from a purported drug source city is "so broad as to be

11

indicative of almost nothing"); *contra* Doc. 28 at 26. These are unremarkable facts and are "entirely consistent with innocent travel such that, in the absence of contradictory information, [they] cannot reasonably be said to give rise to suspicion of criminal activity." *United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997). Although the totality of the circumstances analysis is holistic and not a piece-by-piece inquiry, these facts are so ordinary and "so innocent or susceptible to varying interpretations as to be innocuous." *See White*, 584 F.3d at 950) (quoting *Wood*, 106 F.3d at 946). Nevertheless, Rohr's consideration of these unpersuasive factors does not negate the otherwise valid bases for his objectively reasonable suspicion. Based on the totality of the circumstances, Rohr therefore had reasonable suspicion of drug trafficking that warranted prolonging the initial traffic stop to investigate drug-related criminal activity.

### C

Vasquez also briefly argues that the search itself was unreasonable because Vasquez's consent to the search was not voluntary. Doc. 29 at 6–7; *see also* Doc. 22 at 11. But because the encounter was voluntary at that point and the circumstances were not coercive, the consent to the search itself was also voluntary. And even if the encounter had not become voluntary, Rohr received valid, explicit permission to search the car after detaining Vasquez on reasonable suspicion grounds.

**1.** The Fourth Amendment prohibits searching the interior of a vehicle "unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search." *United States v. Forbes*, 528 F.3d 1273, 1277–78 (10th Cir. 2008). A law enforcement official may search a vehicle if "a person in control of the vehicle has given his voluntary consent to the search." *United States v. Lyons*, 510 F.3d 1225, 1239 (10th Cir. 2007).

To meet the voluntariness requirement, the consent must have been both "unequivocal and specific and freely given" and "given without duress or coercion, express or implied." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). For consent to be "freely given," it must be clear, but "need not be verbal." *Id.* The person in control of the vehicle need only have acquiesced to a search in a way that is "sufficiently comprehensible to a reasonable officer." *Id.* at 789–90.

The Government must also prove the consent "was in fact 'voluntary'" instead of "the product of duress or coercion, express or

12

implied." *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). In determining voluntariness, courts consider the totality of the circumstances, just as for determining whether a police encounter was consensual. *Id.* But even though the test is the same, the Tenth Circuit has enumerated slightly different factors to consider. *Id.* Most important is the officer's conduct relating to the person in control of the vehicle, including whether the officer physically mistreated him; informed him of his right to refuse consent; displayed weapons; or otherwise used "violence, threats, promises, inducements, deception, trickery, or an aggressive tone." *Id.* (citing *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006)). Other circumstances must be considered as well, including "the number of officers on the scene" and the "physical and mental condition and capacity of the defendant." *Id.*

**2.** Much of the analysis of Vasquez's consent to further questioning also applies to his consent to the search, and the conclusion is the same: Vasquez voluntarily consented to the search. The additional factors the Tenth Circuit cited in *Harrison* do not change the outcome.

Vasquez gave unequivocal, specific consent to Rohr to search his car. Rohr asked, "Can I search the car?" Doc. 22 at 5. Vasquez responded, "Sure." *Id.* Vasquez does not appear to contest that his acquiescence to the search was clear.

Vasquez's consent to search was also voluntary, not "the product of duress or coercion." *Harrison*, 639 F.3d at 1278. As noted above, Rohr did not physically touch or threaten Vasquez, use an aggressive tone, or brandish his weapon. Doc. 28 at 16. Nor did he make any threats or promises. Rohr was the only officer present during the stop, questioning, and subsequent search. *Id.* And Vasquez does not claim that poor physical or mental condition or diminished capacity motivated him to consent to the search. Although Rohr did not inform Vasquez of his right to decline providing consent, he was not required to do so as long as he did not coerce Vasquez. *Harrison*, 639 F.3d at 1279. Rohr did not "convey a message that compliance with [his] request [was] required," *Id.* at 1280 (quoting *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994)), nor did he "claim[] authority to search [the car] under a warrant" and thereby imply that Vasquez "ha[d] no right to refuse consent to search," *Eidson v. Owens*, 515 F.3d 1139, 1147 (10th Cir. 2008). There is no indication that Rohr used any coercive techniques to make Vasquez consent to the search. Under the circumstances, a reasonable person in Vasquez's position would have

13

felt free to decline Rohr's request to search his car. The Government has therefore adequately shown that Vasquez's consent to the search was voluntary.

### III

For the foregoing reasons, Vasquez's motion to suppress evidence obtained from that search is therefore DENIED.

It is so ordered.

Date: October 28, 2022            s/ Toby Crouse
                                  Toby Crouse
                                  United States District Judge